UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,                    CR. NO.  97-50021

    v.

                                                  HON. BERNARD A. FRIEDMAN

ERVIN JUNIUS THORNTON, II

                    Defendant.
_____/

## COMBINED MOTION FOR COMPASSIONATE RELEASE & FOR SENTENCE REDUCTION UNDER THE FIRST STEP ACT

Ervin Junius Thornton, II, was only 13 years old when he was recruited into a drug conspiracy, and at age 19, was involved in a related murder. Under the then-mandatory Guidelines, Judge Gadola sentenced him to life without parole. He had never been convicted of a crime before.

Much has changed since 1998: the law, our understanding of youth, and Mr. Thornton, himself. Thanks to the First Step Act of 2018 (1SA), this Court has the power to take a second look at Mr. Thornton. Today, he is a 45-year-old man scored by prison officials as a "low" risk of recidivism. He has aging, ailing parents who he loves and will care for if released. And he is at risk from COVID-19 if his incarceration continues. All of his codefendants have been released. He asks this Court to reduce his

1

sentence to time served and allow him the chance to be a productive member of society under strict terms of supervision by the probation department.

The 1SA provides this Court with two mechanisms to reduce Mr. Thornton's sentence: First, 18 U.S.C. § 3582(c)(1)(A), otherwise known as compassionate release; Second, § 404 of the 1SA. *See* Pub. L. No. 115-391, 132 Stat. 5194, § 404(a) (2018). This Court should grant Mr. Thornton a sentence reduction for six primary reasons: (1) he was only 19 at the time of the murder; (2) he missed application of *Miller* because of an untimely filing; (3) his life sentence was mandatory under the Guidelines (and thus unconstitutional); (4) his strong rehabilitation; (5) his parents require his assistance; and (6) his risk from COVID-19.

## CONCLUSION

Mr. Thornton should not be serving a life sentence. This Court should reduce his sentence to time served. In the alternative, this Court should reduce the sentence to a set term to give him the chance for release.

Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**

s/ Colleen P. Fitzharris
Attorney for Ervin Thornton, II
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5868
E-mail: colleen_fitzharris@fd.org

Date:  December 21, 2020

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                Plaintiff,              CR. NO.  97-50021

    v.

                                    HON. BERNARD A. FRIEDMAN

ERVIN JUNIUS THORNTON, II

                Defendant.

_____/


**BRIEF IN SUPPORT OF**
**COMBINED MOTION FOR COMPASSIONATE RELEASE &**
**FOR SENTENCE REDUCTION UNDER THE FIRST STEP ACT**

1

# TABLE OF CONTENTS

BACKGROUND.................................................................................................. 1

DISCUSSION .................................................................................................... 2

    I. Mr. Thornton Should Be Granted Compassionate Release............................. 2

        A.      Governing standard ............................................................... 2

        B.      Mr. Thornton's case presents extraordinary and compelling reasons
              to reduce his life sentence .................................................... 3

              1.     Youth: Mr. Thornton was a teenager at the time of his crimes
                         ......................................................................... 4

              2.     *Miller* Relief Denied: Due to circumstances outside Mr.
                    Thornton's control, he was precluded from relief .............. 6

              3.     Mandatory Guidelines: the court had to impose a life
                    sentence ........................................................................ 7

              5.     Care for Family: Mr. Thornton's parents are elderly and ill
                           ......................................................................... 10

              6.     The COVID-19 Pandemic: the novel coronavirus poses
                    acute risks to people in custody and Mr. Thornton, in
                    particular ..................................................................... 13

    II. This Court Should Reduce Mr. Thornton's Sentence Under Section 404 of
    the 1SA     …………………………………………………………………...18

        A.      Mr. Thornton was convicted of a "covered offense" ................ 199

        B.      Mr. Thornton's other counts of conviction do not limit this Court's
              ability to grant relief........................................................ 19

    III. A Sentence Reduction to Time Served is Appropriate Because the Goals of
    Punishment Have Been Achieved ...................................................... 21

CONCLUSION .............................................................................................. 26

## BACKGROUND

Ervin Thornton was raised in Flint, Michigan. At the age of 13, he was recruited into a conspiracy to distribute crack cocaine. In May 1997, Mr. Thornton was indicted with Tederick Jones, Jewell Allen, and Otis James Brown for drug and weapons offenses. (PSR ¶ 1) Jones and Mr. Thornton were charged with murder offenses. (*Id.*) Mr. Thornton was the youngest defendant. Brown was approximately 34. Allen and Jones were about 26. Mr. Thornton was only 22 years old at the time of the indictment.

Lee Davis Strickland was one of Flint's largest crack cocaine dealers. In 1995, he was arrested and indicted on federal drug charges. Fellow drug dealer Allen became concerned that Strickland would cooperate against him, so he arranged for Strickland's murder. Jones and 19-year-old Mr. Thornton went to Strickland's place of work and shot into Strickland's car, killing Lee and Fanny Strickland. (PSR ¶ 12)

Unlike the older co-defendants, Mr. Thornton, who had never been charged with any crime before, elected to go to trial. It was a terrible mistake. After the jury found him guilty, the district court was required by then-mandatory Guidelines to impose a life sentence without parole. All of Mr. Thornton's co-defendants have been released: Jones in 2006, Brown in 2005, and Allen in 2014. Only Mr. Thornton remains in prison.

Before Mr. Thornton's arrest, he had graduated high school with a 2.5 GPA. (PSR ¶ 61) From 1993 until his arrest, he worked in factories, as a salesperson, in an auto shop, truck loader, and as a bus driver. (PSR ¶¶ 65–71)

## DISCUSSION

The 1SA provides this Court with two mechanisms to reduce Mr. Thornton's sentence: 18 U.S.C. § 3582(c)(1)(A), otherwise known as compassionate release; and § 404 of the 1SA, which made the Fair Sentencing Act retroactive. This Court should grant Mr. Thornton a sentence reduction for six primary reasons: (1) he was only 19 at the time of the murder; (2) he missed application of *Miller* because of an untimely filing; (3) his life sentence was mandatory (and thus unconstitutional); (4) his strong rehabilitation; (5) his parents require his assistance; and (6) his risk from COVID-19.

I.   **Mr. Thornton Should Be Granted Compassionate Release**

**A. Governing standard**

To grant compassionate release, a district court must make three findings: (1) Whether "extraordinary and compelling reasons warrant" a reduction; (2) whether "such a reduction is consistent with *applicable* policy statements issued by the Sentencing Commission.," (3) whether a reduction is appropriate in light of the § 3553(a) factors.[1] When an incarcerated person files the motion, district courts may "skip" the second step and "have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13" because it is no longer "applicable."[2] There

---

[1] *Id.*, at *6 (quotation marks omitted).
[2] *Id.* at *9.

is no exhaustion barrier because Mr. Thornton asked the warden for release more than

30 days ago. (Ex. A, Request to Warden).[3]

### B. Mr. Thornton's case presents extraordinary and compelling reasons to reduce his life sentence

In addition to health-related reasons, courts have found a variety of

circumstances "extraordinary and compelling": the defendant's age at the time of the

crime,[4] non-retroactive changes to 18 U.S.C. § 924(c) stacked sentencing structure,[5]

mandatory guidelines,[6] overly long sentences,[7] extraordinary rehabilitation, and the

---

[3] 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020).

[4] *United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *5 (D. Utah Feb. 18, 2020) (change in law and rehabilitation met standard for sentence reduction).

[5] *See, e.g.*, *United States v. Taniguchi*, No. 2-00-50, 2020 WL 6390061, at *3–5 (S.D. Ohio Nov. 2, 2020); *United States v. Price*, No. 07-0152-06, 2020 WL 5909789, at *2–7 (D.D.C. Oct. 6, 2020); *United States v. Baker*, No. 10-20513, 2020 WL 4696594, at *4 (E.D. Mich. Aug. 13, 2020) (Steeh, J.); *United States v. McPherson*, 454 F. Supp. 3d 1049, 1053 (W.D. Wash. 2020); *United States v. Marks*, 455 F. Supp. 3d 17, 25–26 (W.D.N.Y. 2020); *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, at *4 (D. Neb. Nov. 14, 2019).

[6] *United States v. Jones*, No. 94-20079, 2020 WL 5359636, at *7 (N.D. Cal. Aug. 27, 2020) (*Booker* and the change from mandatory to advisory guidelines among the extraordinary and compelling reasons); *United States v. Quinn*, 467 F. Supp. 3d 824, 827–28 (N.D. Cal. 2020) (mandatory guidelines among the reasons to grant compassionate release); *United States v. Vigneau*, -- F.Supp.3d--, 2020 WL 4345105, *5 (D.R.I. July 21, 2020) (same).

[7] *United States v. Price*, No. 07-0152-06, 2020 WL 5909789, at *4-6 (D.D.C. Oct. 6, 2020) (granting compassionate release to drug defendant sentenced to a mandatory life sentence); *United States v. Day*, --F.Supp.3d --, 2020 WL 4251803, at *12 (E.D. Va. July 23, 2020) (finding extraordinary and compelling reasons where defendant's sentence today would be dramatically different); *United States v. Cantu-Rivera*, No. CR H-89-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019).

need to care for ailing family.[8] Mr. Thornton presents numerous extraordinary and compelling reasons to reduce his sentence from life.

### 1. <u>Youth</u>: Mr. Thornton was a teenager at the time of his crimes

The Supreme Court has acknowledged "what 'any parent knows'" and what science and social science has shown in study after study: juveniles are different.[9] "[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"—for example, in "parts of the brain involved in behavior control."[10] Specifically, the prefrontal cortex of the brain does not reach "full adult maturity" until "the early to mid-20s," and this part of the brain controls impulse control, complex decision-making, inhibition, and planning. (Ex. B, Keating Aff., at 3) This is why young people have a difficult time adjusting risky behavior after they have begun and reject peer pressure. (*Id.* at 3–4) The immature brain and hormonal balances lead young people "to focus more on the benefits of risky behavior than on the possible negative consequences of their actions." (*Id.* at 5)

For all these reasons, the Supreme Court acknowledged, young people lack maturity and have "an undeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk taking."[11] They are also "more vulnerable to negative

---

[8] *United States v. Wooten*, No. 3:13-CR-18, 2020 WL 6119321, at *4 (D. Conn. Oct. 16, 2020) (collecting cases).
[9] *Miller v. Alabama*, 567 U.S. 460, 471 (2012).
[10] *Id.* at 471–72 (cleaned up).
[11] *Miller*, 567 U.S. at 471 (cleaned up).

4

influences and outside pressures, including from their family and peers."[12] And their characters are "not as well formed as an adult's" because their "traits are less fixed and [their] actions less likely to be evidence of irretrievable depravity."[13]

The law treated Mr. Thornton as an adult at the time of some of the offenses because he was 19. But there is a compelling, evidence-based argument to change our approach to criminal conduct by emerging adults (ages 18–25).[14] Emerging adults lack maturity, engage in risky behavior, and are particularly susceptible to peer pressure, leading to poor decision-making and criminal activity. At the same time, they are in a malleable stage of life and capable of changing their behavior. In other areas, the law acknowledges the immaturity of emerging adults and treat them differently: they cannot drink alcohol, rent a car, or open credit cards on their own.[15] Neurologists resist the 18-year cutoff for good reason. The brain does not typically reach full maturity until the mid-20s. (Ex. B, Keating Aff., at 11–12) Trauma and stress also affect behavioral and cognitive development, which studies show delay the development of impulse control and the ability to refrain from risky behavior. (*See id.* at 13–18)

---

[12] *Id.* (cleaned up).

[13] *Id.* (cleaned up).

[14] *See generally* Elizabeth S. Scott et. al., *Young Adulthood As A Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641 (2016); Ex. E, Arnett, Jeffrey Jensen, *Emerging Adulthood: A Theory of Development From the Late Teens Through the Twenties*, Am. Psychologist 469 (May 2000).

[15] *See* Ex. F, Lindell, Karen U. & Goodjoint, Katrina L., *Rethinking Justice for Emerging Adults* 11–12 (2020) (summarizing how the law treats emerging adults differently).

5

Congress has already acknowledged the import of the mountain of evidence explaining why young people are different. Section 608(a)(1) of the 1SA tasked the BOP with creating a program to mentor "youth." It defined "youth" to mean someone "who was 21 years of age or younger at the time of the commission or alleged commission of the criminal offense for which the individual is . . . serving a term of imprisonment."[16]

Mr. Thornton was only 19 years old at the time of the homicide and only 14 years old when the drug conspiracy began. Everyone else involved was significantly older than him. As the youngest of the group, Mr. Thornton was the most susceptible to peer pressure and the least capable of regulating impulse control or risk-seeking behavior. Yet he is the one paying the biggest price for his actions. This sentence disparity and the fact that Mr. Thornton is serving a mandatory life sentence for an offense committed when he was 19 years old are extraordinary and compelling circumstances.

### 2. *Miller* Relief Denied: Due to circumstances outside Mr. Thornton's control, he was precluded from relief

In 2019, the Sixth Circuit authorized Mr. Thornton's request to file a successive 28 U.S.C. § 2255 motion because *Miller* announced a substantive rule—that youthful offenders cannot be sentenced to life without parole—that the Supreme Court made retroactive.[17] (R. 528, 6th Cir. Order) But Mr. Thornton was precluded from relief because of the statute of limitations. (*See* R. 547, Op. & Order, PgID 754–56)

---

[16] 1SA § 608(c).
[17] *Montgomery v. Louisiana*, 136 S. Ct. 718, 731 (2016).

Mr. Thornton missed his opportunity to obtain resentencing after *Miller* because problems outside his control. He first hired an attorney, who incorrectly informed him that he was not eligible for release. (Ex. C, Thornton Aff. ¶¶ 1–3) He then sought clemency and wrongly believed he could not have motions pending during the process. (*Id.* ¶ 4) When he finally had access to the *Montgomery* opinion, the prison went through a nine-month period of lockdowns, which prevented him from accessing his paperwork. (*Id.* ¶¶ 5–9) He filed the petition in December 2016, but sent the motion to the Flint courthouse, and he did not know that the court never received the motion until May 2018. (*Id.* ¶¶ 10–18) By that time, the motion was too late.

Mr. Thornton is not asking the Court to reconsider its ruling on the statute of limitations. But the circumstances that prevented him from filing a timely § 2255 motion are among the "extraordinary and compelling reasons" to grant a sentence reduction.

### 3.   Mandatory Guidelines: the court had to impose a life sentence

Significant legal developments have occurred since Mr. Thornton's trial and sentence. In particular, in 2005, the Supreme Court held that the mandatory sentencing guidelines system violated the Sixth Amendment right to jury trial and declared the sentencing guidelines advisory.[18] If Mr. Thornton were tried and convicted today, although the Guidelines would still recommend a life sentence, this Court would be required to weigh all relevant factors to decide if a life sentence is appropriate. The

---

[18] *United States v. Booker*, 543 U.S. 220 (2005).

7

significant change in sentencing law is an additional extraordinary and compelling reason to reduce Mr. Thornton's life sentence.

### 4. <u>Rehabilitation:</u> Mr. Thornton has worked hard to improve himself

Facing no possibility of returning home, many people would give up. Not Mr. Thornton. He used the past 23 years to better himself and to encourage others to be better. Since arriving at the BOP, he has taken thousands of hours of programming.[19] (Ex. D, Transcript; Ex. E, Oct. 2020 Program Review) Throughout this time, he has developed numerous skills that would make him employable. In 2010, he earned a certificate in the Building Trades Vocational Program. (Ex. F, Building Cert.) This 360-hour program taught Mr. Thornton numerous marketable skills. He has also been taking classes to help people learn how to start a business. (Ex. D, Transcript)

Mr. Thornton most enjoys teaching. He studied to become a GED tutor, and he has been working as a GED tutor whenever possible. (Ex. G, GED Tutoring Certificates; Ex. H, Work Detail) He receives outstanding or good performance reviews. Supervisors routinely say that Mr. Thornton is a quick learner, friendly, eager to assist, knowledgeable, and requires little supervision. (Ex. I, Work Evaluations)

Mr. Thornton's work assignments further demonstrate his trustworthiness and efforts to better himself and others. He is often given plum assignments as a unit

---

[19] These documents do not capture all of the programming Mr. Thornton has completed because the list begins only in 2009; he has been in BOP since 1999.

orderly, library worker, recreation worker, or carpenter assistant. (Ex. H, Work Detail) Most recently, Mr. Thornton has been assigned to the UNICOR education work detail.

Mr. Thornton has taken classes geared towards preventing recidivism. In 2006, he completed the Drug Abuse Education Program. (Ex. J, Drug Abuse Edu. Cert.) In 2012, Mr. Thornton completed the 500-hour Challenge Program. (Ex. K, Challenge Certs.) This program "is a cognitive-behavioral, residential treatment program" in a "modified therapeutic community" for people with a history of substance abuse and/or mental illnesses.[20] Throughout the program, he took classes in rational thinking, lifestyle balance, the criminal lifestyle, communication, violence prevention, recovery maintenance, and transitioning. (*Id.*) In addition, he has taken classes in anger management, victim impact, financial management, and building healthy relationships. (Ex. D, Transcript)

Most recently, Mr. Thornton completed the Threshold Program, a faith-based program focused on developing spirituality and character. (Ex. L, Threshold Cert.) Spirituality is very important to Mr. Thornton. Before the pandemic caused the BOP to shut down programs, he was involved in the Principles of Godly Leadership Program at Coleman I. (Ex. D, Transcript)

---

[20] Fed. Bureau of Prisons, *Director of National Programs* (May 18, 2017), https://www.bop.gov/inmates/custody_and_care/docs/20170518_BOPNationalProgramCatalog.pdf.

9

The people who know what kind of person Mr. Thornton is now—his fellow incarcerated people—speak uniformly of his kindness and generosity. Mr. Harris explains that he has been suffering from cancer, and Mr. Thornton volunteers to push his wheelchair and helps him with cleaning the room and washing clothes. (Ex. M, Harris Letter) Mr. Cole describes a tireless tutor who patiently helps men study to take the GED. (*Id.*, Cole Letter) Mr. Ferguson explains how Mr. Thornton has helped him not only when he has seizures, but also how to respect himself and others. (*Id.*, Ferguson Letter) What is clear from these letters is that many see Mr. Thornton as a positive force in their lives.

Mr. Thornton's effort to deepen his faith, reflect on his crime, and to build skills so that he can contribute to society are commendable. They are also extraordinary and compelling reasons to reconsider the appropriateness of the life sentence.

**5.   <u>Care for Family:</u> Mr. Thornton's parents are elderly and ill**

Mr. Thornton is one of Mary Kennedy's two children. (PSR ¶ 53) His parents divorced when he was only five years old. After the divorce, Mr. Thornton rarely saw his father. (PSR ¶ 55) Mrs. Kennedy remarried Rev. James Kennedy. Mr. Thornton's sister, Stephanie, is Mrs. Kennedy's only other source of support.

In the years since Mr. Thornton was convicted and sentenced, Mrs. Kennedy has remained a devoted, loving mother. She traveled far across the country to see her son. Now, her health is declining. She is 73 years old, has Type 2 diabetes, Stage 3 chronic

10

kidney disease, and arthritis. Rev. Kennedy requires a lot of assistance because he is in the early stages of dementia, cannot move without the assistance of a walker, and suffers from muscular degeneration in both eyes, Type 2 diabetes with seizures, and kidney failure, which requires dialysis three times a week. (Ex. N, Kennedy Decl.) Mrs. Kennedy does not have the strength to continue to support Rev. Kennedy if he falls.

A growing number of "courts have found that 'extraordinary and compelling reasons' may exist when a defendant is the only available caregiver of incapacitated close family members other than spouses and registered partners—particularly, parents."[21] In *United States v. Reyes*, the defendant's aunt had stage four cancer, and he sought release because his family was struggling to manage her care.[22] Finding that Subdivision (D) of the policy statements was meant to "especially recognize non-traditional family arrangements and the need for others in the family to contribute when a relative is sick," the court granted release.[23]

The mere existence of another family member does not necessarily mean that another caregiver is *reasonably* "available," or is fairly capable of assuming or continuing

---

[21] *United States v. Wooten*, No. 3:1a3-CR-18, 2020 WL 6119321, at *4 (D. Conn. Oct. 16, 2020) (collecting cases).
[22] No. 04-CR-970, 2020 WL 1663129 at *3 (N.D. Ill. Apr. 03, 2020).
[23] *Id.*

the burden of care.[24] And even when courts have found that another caregiver is *technically* available, but with difficulty, that situation was nonetheless a substantial factor in the decision to grant compassionate release.[25]

Rev. and Mrs. Kennedy are not able to care for themselves on their own. Mrs. Kennedy cannot lift Rev. Kennedy, so if he falls, emergency medical services must come to lift him off the floor. Although Stephanie Thornton is an hour away from her mother, she is not able to help her parents to the extent Mr. Thornton would be able

---

[24] *See, e.g.*, *United States v. Hernandez*, No. 16-20091, 2020 WL 4343991 (S.D. Fla. April 3, 2020) (finding compassionate release warranted where defendant was the only *reasonably* available caregiver for his ailing 84-year-old mother, where one brother could no longer reasonably perform caregiving duties, and the other brother "[wa]s employed full-time at a warehousing and shipping operation and is not positioned to provide personal care, arrange medical monitoring, or perform activities of daily living with their mother," Dkt. No. 553 at 3-4); *United States v. Riley*, No. 2:12-cr-62, Dkt. No. 132 at 2, 2020 U.S. Dist. LEXIS 82909 (D. Vt. May 12, 2020) (granting compassionate release where "none of his three siblings c[ould reasonably] provide such care" to their ailing father – one due explicitly to the demands of his employment, Dkt. No. 123 at 7); *United States v. Mankin*, No. 1:18-CR-132, Dkt. No. 106 at 1-2 (D. Colo. Nov. 6, 2020) (granting compassionate release to inmate where, although another family member had assumed care of her child, "doing so has been a burden due to the unavailability of other family members to share much of the task . . . and the demands of her employment as a realtor."); *United States v. Bucci*, 409 F.Supp.3d 1 at *2 (D. Mass. Sept. 16, 2020) (granting compassionate release motion for inmate to care for his ailing mother, recognizing that Bucci was fairly the "only potential caregiver," where her brother was "not capable of caring for her," Dkt. No. 656 at 8).

[25] *See, e.g.*, *Wooten*, 2020 WL 6119321, at *9 ("Wooten's desire to care for his sister and to help Mrs. Wooten is the weightiest consideration contributing to the extraordinary and compelling reasons warranting Wooten's release in this case."); *United States v. Walker*, 2019 WL 5268752 at *3 (N. D. Ohio, Oct. 17, 2019) (finding "the failing health of [Walker's] mother" and the opportunity to earn money to contribute to her care among reasons to grant motion for compassionate release in part).

to. (Ex. O, Stephanie Thornton Letter) If released, Mr. Thornton would live with his mother and stepfather and take on the responsibility to care for them. He would be able to assist Rev. Kennedy get about the house, take his parents to medical appointments, and help with all housework.

6. **The COVID-19 Pandemic: the novel coronavirus poses acute risks to people in custody and Mr. Thornton, in particular**

Detention facilities are associated with high transmission probabilities for infectious diseases.[26] Positive-COVID-19 cases in BOP continues to increase, and there is evidence that the public numbers undercount how many people are actually infected. BOP facilities that implemented testing saw dramatic increases in the number of cases.[27] To date, 34,408 people in BOP custody have contracted COVID-19. 169 incarcerated people have died.[28] At Coleman I USP, where Mr. Thornton is currently incarcerated, there are 4 active cases amongst incarcerated people and 32 cases amongst staff.[29] Of the 1,141 people at Coleman I, there are 46 incarcerated people awaiting test results.[30] Media accounts confirm that many who test positive for COVID-19 in BOP receive

---

[26] *See* Joseph A. Bick, *Infection Control in Jails and Prisons*, Clinical Infectious Diseases 45(8):1047-1055 (2007), available at https://doi.org/10.1086/521910.

[27] *See, e.g.*, Walter Pavlo, *After Seeing Federal Bureau of Prisons Up Close, Federal Judges May See Sentencing Differently in Future*, Forbes (May 3, 2020), shorturl.at/dtN89; Luke Barr, *70% of inmates tested have COVID-19: Bureau of Prisons*, ABC News (May 1, 2020), shorturl.at/ayLRZ.

[28] Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited Dec. 21, 2020).

[29] *Id.*

[30] *Id.*

virtually no care, and that staff have "ignored or minimized . . . COVID-19 symptoms, and mixed the sick and healthy together in haphazard quarantines." [31]

The Department of Justice Office of Inspector General (OIG) recently found that "[m]aintaining a safe, secure, and humane prison system remains a challenge for DOJ and the BOP." [32] Those in federal detention who have been spared by COVID-19 still suffer: during the pandemic medical care for chronic conditions has been delayed and, in many cases, withheld entirely. An OIG inspection of Metropolitan Detention Center (MDC) Brooklyn, found that "sick call requests dating to early July 2020 had not been scheduled or seen as of late September 2020." [33] At Butner Federal Medical Center, a lawsuit alleges that when people do get sick with COVID-19, "treatment is almost nonexistent," and that people are generally not transferred to a hospital until

---

[31] Keri Blakiger & Keegan Hamilton, *"I Begged Them to Let Me Die": How Federal Prisons Became Coronavirus Death Traps* (June 18, 2020), https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps; *see also* Daniel Brown & Nkechi Taifa, *Congress must do more to protect people in prisons and jails and those re-entering the community*, Des Moines Register (Sept. 9, 2020), https://www.desmoinesregister.com/story/opinion/columnists/iowa-view/2020/09/09/covid-19-exposes-injustice-treatment-people-in-exiting-prisons/5685625002/.

[32] Michael E. Horowitz, Dep't of Justice, Office of Inspector General, *Top Management and Performance Challenges Facing the Department of Justice* 16 (Oct. 16, 2020), available at https://oig.justice.gov/sites/default/files/reports/2020.pdf.

[33] Dep't of Justice, Office of the Inspector General, *DOJ Releases Report of Remote Inspection of Federal Bureau of Prisons Metropolitan Detention Center Brooklyn Examining the Institution's Response to the Coronavirus Pandemic* (Nov. 10, 2020), https://oig.justice.gov/news/doj-oig-releases-report-remote-inspection-federal-bureau-prisons-metropolitan-detention-center.

14

"they are already experiencing respiratory failure."[34] The BOP has been slow to use its expanded powers to grant home confinement. A nationwide survey of federal defenders revealed that BOP has not initiated a single motion for compassionate release based on COVID-19.

Although Mr. Thornton has been at USP Coleman I for approximately two years, none of the medical records provided by the government list his height or weight. This is concerning because it demonstrates that Mr. Thornton has not had a physical examination during that time. (Gov't Ex. B, Med. Recs, at 1) That fact also means that doctors have not conducted any lab work to determine if he suffers from any diseases. (*Id.* at 2) Despite this limited information, there is still cause to be concerned about Mr. Thornton's health and safety in BOP custody because of the COVID-19 pandemic: he is obese and a former smoker.

*Obesity.* The last time Mr. Thornton weighed himself, he was 228 lbs. At 6' tall, that means his body mass index (BMI) is 30.9, which classifies him as obese.

The CDC has labeled obesity as a risk factor with the "strongest and most consistent evidence" for an association with severe illness from COVID-19.[35] This recognition of risk is in line with research detailing that individuals less than 60 years

---

[34] *Hallinan v. Scarantino*, No. 5:20-cv-00563-M, Compl. ¶¶ 78–79, available at https://www.aclu.org/legal-document/complaint-aclu-files-class-action-lawsuit-against-butner-fcc.

[35] *See* CDC, *Medical Conditions Evidence Table*, https://rb.gy/zdj1s.

15

old, with a BMI from 30 to 34 are twice as likely to need acute medical care related to COVID-19 than those with a BMI less than 30.[36] Further, individuals under 60 years old with BMIs between 30 and 34 were 1.8 times more likely to need care in an Intensive Care Unit than those with BMIs under 30. *Id.*

In fact, obesity is one of the most serious risk factors for younger individuals admitted to the hospital as a result of COVID-19.[37] "Obesity can restrict ventilation by impeding diaphragm excursion, impairs immune responses to viral infection, is pro-inflammatory, and induces diabetes and oxidant stress to adversely affect cardiovascular function." *Id.*

At least two judges in this district have released an incarcerated person, in light of the COVID-19 pandemic, where the *only* identified risk factor was a BMI over 30 and under 40.[38] Another judge in this district granted on the basis of a BMI of 30.6 along with latent TB.[39]

---

[36] Jennifer Lighter et al., *Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission*, Clinical Infectious Diseases (2020), https://perma.cc/LP4H-V3F4.

[37] David A. Kass, *et al.*, *Obesity could shift severe COVID-19 disease to younger ages*, The Lancet (May 16, 2020), https://perma.cc/5HFW-89TA.

[38] *United States v. Mitchell*, No. 17-20652, 2020 WL 4284311, at *3 (E.D. Mich. July 27, 2020) (granting release to inmate with BMI of 31 to 32); *United States v. Roe*, No. 15-20581, ECF No. 374 (E.D. Mich. July 16, 2020) (initially denying release but later granting release to inmate with BMI over 35 but under 40 after the CDC changed its guidance on obesity).

[39] *United States v. Ireland*, No. 17-20203, 2020 WL 4050245, at *4 (E.D. Mich. July 20, 2020).

16

In multiple cases, the government has agreed that a BMI over 30 satisfies the "extraordinary and compelling" standard.[40] The fact that Mr. Thornton is obese puts him at an increased risk if he were to get sick.

*History of Smoking.* Before his arrest, Mr. Thornton was a regular cigarette and marijuana smoker. "Being a current or former cigarette smoker increases your risk of severe illness from COVID-19."[41] Indeed, "research suggests that the risk presented from smoking is not merely speculative."[42] Because COVID-19 "is a respiratory disease," and smoking affects lung function, this history puts a person at higher risk from the disease. [43] "Considering this correlation between a history of smoking and risks associated with COVID-19, courts have granted compassionate release to individuals with histories of smoking."[44] At least two judges in this district have granted compassionate release in part because of a person's history of smoking.[45]

---

[40] *See, e.g, United States v. Ireland*, No. 17-20203, R. 35-1, Gov. Email, PgID 200 (E.D. Mich. July 17, 2020) (conceding that the defendant's BMI of 30.6 "means he satisfies the 'extraordinary and compelling' standard under 1B1.13(1)(A).")
[41] CDC COVID-19 Vulnerability List, *supra*, https://perma.cc/C8P6-66LM.
[42] *United States v. Galaz*, No. 15-CR-02559-GPC, 2020 WL 4569125, at *4 (S.D. Cal. Aug. 7, 2020) ("The CDC has identified smoking as a condition which might put an individual at increased risk of for severe illness from COVID-19.")
[43] *Id.* (citing studies).
[44] *Id.* (citing *United States v. Mueller*, No. 08-CR-139-AB, 2020 WL 3791548, at *3 (E.D. Pa. July 7, 2020); *United States v. Rich*, No. 17-CR-94-LM, 2020 WL 2949365, at *4 (D.N.H. June 3, 2020)).
[454545] *See United States v. Brady*, No. 18-20106, 2020 WL 7053811, at *1 (E.D. Mich. Dec. 2, 2020); *United States v. Andrade*, No. CR 16-20751, 2020 WL 5505344, at *2 (E.D. Mich. Sept. 11, 2020).

17

Even if Mr. Thornton is not in the group of people at the highest risk of severe illness, the threat of COVID-19 is still serious and among the "extraordinary and compelling" reasons to reduce his sentence. Relative youth does not save people. Just recently, at FCI Coleman I, a 38-year-old man died because of COVID-19.[46] And we still do not know the long-term effects of COVID-19.[47] The COVID-19 is a once-in-a-lifetime public health crisis that threatens the healthy and sick alike.

II.    **This Court Should Reduce Mr. Thornton's Sentence Under Section 404 of the 1SA**

In addition to compassionate release, the 1SA grants courts discretion to reduce sentences for people convicted of "covered offense[s]." In ruling on such motions, courts may "impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 [FSA] were in effect at the time the covered offense was committed."[48] There are two limits: Sentences previously reduced under the FSA may not be reduced again, and people previously denied an FSA reduction on the merits may not file a 1SA motion.[49] Neither limitation applies here.

---

[46]   BOP, *Press Release: Inmate Death at FCI Coleman (Medium)* (Dec. 9, 2020), https://www.bop.gov/resources/news/pdfs/20201210_press_release_col.pdf.

[47]   Thompson, Derek, *What Young, Healthy People Have to Fear From COVID-19* (Sept. 7, 2020), https://www.theatlantic.com/ideas/archive/2020/09/what-young-healthy-people-have-fear-covid-19/616087/.

[48]   *Id.* § 404(b).

[49]   *Id.* § 404(c).

18

### A. Mr. Thornton was convicted of a "covered offense"

A "covered offense" is a federal crime (committed before August 3, 2010) for which the statutory penalties were modified by the FSA.[50] "[E]ligibility for resentencing under the First Step Act turns on the statute of conviction alone."[51] It does not matter whether the FSA modified the penalties for the violation,[52] whether a person was subject to the career-offender enhancement,[53] or whether the Guidelines are lower than at the time of conviction.[54]

Mr. Thornton was convicted of offenses for which the FSA modified the statutory penalties. The FSA modified the penalties of 21 U.S.C. §§ 841(b)(1)(A) and 841(b)(1)(B). Counts 6, 8, and 10 are covered offenses: violations of 21 U.S.C. §§ 841(b)(1)(B) and 841(b)(1)(C). Mr. Thornton was held accountable for 1.5 kilograms of crack cocaine. (PSR ¶ 19) He is therefore eligible for a sentence reduction.

### B. Mr. Thornton's other counts of conviction do not limit this Court's ability to grant relief

After determining that a person is eligible for a sentence reduction under the 1SA, which is a legal question, courts then weigh whether to exercise the discretion to reduce the sentence.[55] In deciding whether to grant resentencing, this Court can

---

[50] *Id.* § 404(a).
[51] *United States v. Boulding*, 960 F.3d 774, 781 (6th Cir. 2020).
[52] *Id.* at 782.
[53] *United States v. Beamus*, 943 F.3d 789, 791 (6th Cir. 2019).
[54] *United States v. Flowers*, 963 F.3d 492, 497–98 (6th Cir. 2020), *reh'g denied* (July 31, 2020).
[55] *Boulding*, 960 F.3d at 782.

"consider all relevant factors," but "the necessary review—at a minimum—includes an accurate calculation of the amended guidelines range at the time of resentencing and thorough renewed consideration of the § 3553(a) factors."[56]

The text of the 1SA does not limit this Court's discretion to reduce Mr. Thornton's sentence even for non-covered offenses. Section 404(b) says that if a court "imposed a sentence for a covered offense" the court may "impose a reduced sentence as if" the FSA "were in effect at the time the covered offense was committed."[57] "That language does not bar a court from reducing a non-covered offense."[58] "Excluding non-covered offenses from the ambit of [1SA] consideration would, in effect, impose an extra-textual limitation on the Act's applicability."[59] And Congress established only two limitations on the relief available under the 1SA: (1) defendants who already filed motions under the FSA and received "complete review" could not file again, and (2) district courts are not "require[d] . . . to reduce any

---

[56] *Id.* at 784.
[57] 1SA § 404(b).
[58] *United States v. Hudson*, 967 F.3d 605, 610 (7th Cir. 2020) (a district court can reduce the sentence even though the defendant was convicted of a firearms offense); *see also United States v. Gravatt*, 953 F.3d 258, 264 (4th Cir. 2020) (1SA authorizes resentencing for a defendant convicted of a dual-object conspiracy to distribute crack and powder cocaine).
[59] *Id.*

20

sentence."[60] "If Congress intended the Act not to apply when a covered offense is grouped with a non-covered offense, it could have included that language. It did not."[61]

Allowing full reconsideration "comports with the manner in which sentences are imposed," where sentences are a package of several parts "treated under federal law as a single, aggregate term of imprisonment."[62] This Court therefore can consider whether to reduce Mr. Thornton's sentence. [63]

## III. <u>A Sentence Reduction to Time Served is Appropriate Because the Goals of Punishment Have Been Achieved</u>

In exercising discretion to grant compassionate release or a sentence reduction under § 404, this Court "must consider the factors outlined in 18 U.S.C. § 3553(a), including the defendant's amended guidelines range, and then ensure that the sentence is sufficient but not greater than necessary to achieve the purposes of sentencing."[64]

The goals of just punishment have been accomplished. Mr. Thornton has been in custody since May 1997, 282 months, or 23 and a half years. This is the equivalent to

---

[60] 1SA § 404(c).

[61] *Hudson*, 967 F.3d at 610.

[62] *Id.* at 611 (citing 18 U.S.C. § 3584(c)).

[63] The Sixth Circuit has not had occasion to address whether district courts may resentence people with hybrid sentences for covered and no-covered offenses. Nonetheless, Judge Stranch noted her agreement with the Seventh Circuit and that every other circuit court to consider the issue had agreed that resentencing is authorized even for hybrid sentences. *See United States v. Mitchell*, No. 19-1984, 2020 WL 6117698, at *3–4 (6th Cir. Oct. 16, 2020) (Stranch, J., concurring).

[64] *Flowers*, 963 F.3d at 498 (under § 404); *see also Jones*, 2020 WL 6817488, at *5 (consideration of the § 3553(a) factors is the third step of the compassionate-release analysis).

a sentence of nearly 28 years once good time is taken into account. He has served longer than the statutory minimum penalty he would face if convicted today (15 years).[65] But the 23 years he has served achieves the purposes of punishment. To the extent Mr. Thornton has additional work to do or debt to pay, this Court can fashion conditions of release to encourage that behavior.

Mr. Thornton's age at the time of the offenses bears on all of the § 3553(a) factors. These "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes."[66] Retribution has to do with the person's blameworthiness, and young people are less culpable than adults.[67] Deterrence carries less weight, too, because of the "immaturity, recklessness, and impetuosity" of young people "make them less likely to consider potential punishment."[68] Incapacitation also does not necessarily justify a life sentence for young people because "[d]eciding that a juvenile offender forever will be a danger to   society would require making a judgment that he is incorrigible—but

---

[65] Count 1, 21 U.S.C. § 846 (drug conspiracy), had a 10-year mandatory minimum penalty. Count 5, 18 U.S.C. § 924(c) (use of a firearm during or in relation to a felony drug offense), required a 5-year sentence consecutive to the drug sentence. And Count 8, 21 U.S.C. § 841, carried a 5-year mandatory minimum sentence. Even if all of these mandatory counts were consecutive, the minimum sentence would be 20 years' imprisonment.

[66] *Miller*, 567 U.S. at 472.

[67] *Id.*

[68] *Id.*

22

incorrigibility is inconsistent with youth."[69] And rehabilitation cannot justify a life sentence because juveniles are the most likely to change with time and maturity, in part, because of continuing neurological developments. (Ex. B, Keating Aff., at 9–10)

There is no question Mr. Thornton has been convicted of serious crimes. Death is always serious. But a life sentence is not always appropriate when someone is convicted of murder. Throughout the country, district courts routinely impose non-life sentences for murder. For instance, in 2019, the median sentence for murder was 20 years. The mean sentence was 21 years.[70] Mr. Thornton has served longer than both the median and mean sentences imposed for his crime, which suggests a life sentences is not always necessary to reflect the seriousness of the offense.

There is no need to maintain the life sentence to deter Mr. Thornton from repeating his behavior. The U.S. Sentencing Commission recently issued a data-based report that adds to the body of evidence proving that lengthy sentences do not deter. The Commission compared the rate of recidivism of two groups of people—those released early because of retroactive changes to the Guidelines and those who would have been eligible for a reduction, but had served their full sentence. There was no meaningful difference between the recidivism rates of the two groups.[71]

---

[69] *Id.* at 472–73.

[70] [70] *See 2019 Annual Report and Sourcebook of Federal Sentencing Statistics*, U.S. Sentencing Comm'n, at 64, available at https://www.ussc.gov/research/sourcebook-2019.

[71] U.S. Sentencing Comm'n, *Retroactivity & Recidivism: The Drugs Minus Two Amendment* (July 2020), https://www.ussc.gov/sites/default/files/pdf/research-and-

Mr. Thornton is much older, more mature, and wiser than when he was 19 years old. He is not a danger to the community. Although he has been convicted of a violent crime, "[w]ithin any given age bracket, individuals released after imprisonment for violent crimes recidivate at a lower rate than releasees who served time for any other category of crime."[72] Indeed, "99% of those who previously served time for murder or nonnegligent manslaughter do not commit another murder or nonnegligent manslaughter upon release."[73]

Although Mr. Thornton's disciplinary record in prison is not spotless, it does not show that he is dangerous. In the past five years, he has been disciplined three times for possessing an unauthorized item, assault without serious injury, and email abuse. (R. 588, Gov't Opp'n, PgID 870) Mr. Thornton is currently appealing the most recent allegation of email abuse, alleging he is using a text service, and he has successfully challenged citations for the very same conduct. (Ex. P, 2020 Incident Reports) The alleged assault in 2018 was for "forcing himself past" a guard. (Ex. Q, 2018 Incident Report) Before then, the last time Mr. Thornton was sanctioned for any kind of assaultive conduct was in 2007, when he was defending himself and cited for fighting.

---

publications/research-publications/2020/20200708_Recidivism-Drugs-Minus-Two.pdf.
[72] J.J. Prescott, Benjamin Pyle, Sonja B. Starr, *Understanding Violent-Crime Recidivism*, 95 Notre Dame L. Rev. 1643, 1688 (2020).
[73] *Id.* at 1689.

(*Id.*, PgID 872) The BOP sanctioned Mr. Thornton sufficiently for his conduct and it was not so severe to warrant denying his motion.[74]

Moreover, even the BOP considers Mr. Thornton a low risk of recidivism. His most recent PATTERN score is low. (Ex. R, PATTERN Score)

A sentence reduction would address a glaring sentence disparity in this case. Mr. Thornton is the only person charged in this indictment who is still in prison even though he was the youngest of all. The person who paid to have Strickland killed is out of prison. The other person alleged to have shot into the car is also out of prison. And a sentence of time served (approximately 23 years) is still above the average sentence for murder imposed.

Finally, Mr. Thornton has taken his time in prison to work on himself. He is employable. He is a mentor. And he can be an asset to the community. To the extent he needs additional skills or therapy, supervised release can provide those services.

---

[74] *United States v. Clemons*, No. 3:08-CR-102, 2020 U.S. Dist. LEXIS 12879, at *10 (E.D. Tenn. Jan. 27, 2020) (reducing a 360-month sentence of a defendant with 17 prior convictions who had been sanctioned by the BOP three times in the six months before his motion was filed).

25

**CONCLUSION**

Mr. Thornton should not be serving a life sentence. This Court should reduce his sentence to time served. In the alternative, this Court should reduce the sentence to set term to give him the chance for release.

Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**

s/ Colleen P. Fitzharris
Attorney for Ervin Thornton, II
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5868
E-mail: colleen_fitzharris@fd.org

Date:  December 21, 2020

**CERTIFICATE OF SERVICE**

Counsel certifies that on the above date, the foregoing paper was filed with the clerk of the Court using the ECF system, which will send notification to opposing counsel.

Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**

s/ Colleen P. Fitzharris
Attorney for Ervin Thornton, II
613 Abbott Street, Suite
Detroit, Michigan 48226
313-967-5868
E-mail: colleen_fitzharris@fd.org

Date:  December 21, 2020

26